**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| NICOLE ESPERSON | ) |
| | ) |
| Plaintiff, | ) Case No. 15-cv-8298 |
| | ) |
| v. | ) Judge Sharon Johnson Coleman |
| | ) |
| CELLCO PARTNERSHIP, d/b/a VERIZON WIRELESS, INC., | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

The plaintiff, Nicole Esperson, brings this action against Cellco Partnership, which does business as Verizon Wireless, Inc. ("Verizon"). Esperson alleges that she was discriminated against based on her sex, discharged in retaliation for statutorily protected activities, and subjected to a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, that Verizon negligently retained an employee in violation of Illinois law, and that Verizon defamed her in violation of Illinois law. Verizon moves for summary judgment on all counts. For the reasons set forth herein, that motion [67] is granted in part and denied in part.

**Background**

The following facts are undisputed unless otherwise noted.[1] Esperson began working for Verizon Wireless in June 2010 as a retail sales representative at Verizon's Arlington Heights store. As a retail sales representative, Esperson was responsible for selling Verizon products and services, greeting customers, upgrading devices, stocking the sales floor, and putting shipments away in inventory. Esperson's performance was based on monthly sales quotas applicable to all retail sales

---

[1] Esperson's additional statements of fact ¶¶ 9, 39, and 45–57 do not comply with the requirements of local rule 56.1(b)(3)(C) and are accordingly stricken. Although exhibit GG in support of Verizon's Rule 56.1 statement was filed three days late without prior leave of the Court, in light of the de minimis nature of the delay and Esperson's failure to promptly and proactively raise the issue via an appropriate motion this Court declines to strike exhibit GG or to disregard statements of fact relying on it for support.

1

representatives. In December 2010, Esperson transferred to Verizon's Woodfield Mall store. She subsequently transferred to Verizon's Gurnee store in December, 2011. At the Gurnee store, Esperson reported to store manager Alan Zisman and assistant managers Brian King, Henry Sanchez, and Kevin Marolt. Zisman was on a leave of absence in 2013, and during that time Marolt served as the acting store manager. In 2013, Esperson also occasionally reported to Jazzmene Miller, a floating supervisor who filled in when assistant managers or store managers were unavailable.

Retail sales representatives worked three overlapping shifts with staggered start and end times. Lunch breaks were not scheduled, but were instead taken with supervisor approval as retail sales representatives had gaps between customers. Esperson's schedule varied weekly.

In order to assess performance, Verizon employed an annual performance rating system based on set performance objectives. Performance objectives were primarily based on an employee's sales data, but also took into account formal corrective actions for violations of the code of conduct or attendance policy. There were four possible year-end performance ratings given to retail sales representatives: "leading," which was the best rating, "performing," which was an intermediate rating, "developing," which was the lowest possible rating, and "new," which indicated that an employee has been in a position for less than six months and therefore does not have a rating. Verizon also employed a four step escalating performance improvement plan. Under that plan, an employee would receive a verbal warning, a written warning, and a second written warning before a request for termination would be filed with human resources.

Esperson received a "developing" performance review rating in 2011, which reflected her work at the Woodfield Mall store. In March 2012, Esperson received a verbal warning for failing to meet her required sales metrics over a three-month period. In May 2012, Esperson progressed to a first written warning for again failing to meet her required sales metrics over a three-month period.

In June 2012, Esperson received her second written warning for failing to meet her required sales metrics over a three month period. In July 2012, Esperson received a re-issued written warning for failing to meet her sales metrics for the past three months, and was warned that if she did not meet her minimum sales metrics in July she would proceed to the final step of the performance improvement plan, a request for termination. Esperson was not subsequently terminated, but she received a year-end performance review rating of "developing" in 2012. In 2013, Esperson received informal warnings regarding her performance in February, March, May, September, October, and December. In November 2013, Esperson received a formal verbal warning for failing to meet the threshold for sales metrics and was again placed into the performance improvement plan. Accordingly, Esperson received a year-end performance review rating of "developing" in 2013. In January 2014, Esperson received a written warning concerning her failure to meet her required sales metrics for January.

At the time Esperson worked at the Gurnee store, Verizon's human resources operations in the Midwest were managed by executive director Craig Ritchie, who was assisted by associate director Elizabeth McMahon and Ilka Nunez, a human resources consultant. In December 2013, Ritchie instructed an unidentified employee to run a report in the compensation system to identify employees in the Midwest Area with three or more years of consecutive "developing" ratings. This report identified 19 employees who had received "developing" ratings for 2011, 2012, and 2013. Of those 19 employees, 13 were male and 6 were female. Ritchie consulted with Verizon's Vice-President of Human Resources, and the two agreed that the employees on the list had demonstrated a consistent record of nonperformance and should be terminated once the accuracy of the list was confirmed. The list was confirmed to be accurate and, on March 7, 2014, Nunez informed Esperson that she was being terminated based on her three consecutive years of "developing" ratings.

The following facts are subject to dispute and are therefore taken in a light most favorable to the plaintiff. In May 2013, Timothy Murray began working at the Gurnee store. In October 2013, Murray sent his co-worker Esperson a text message confessing his love for her, and stating that if she ever broke up with her boyfriend he would like to take her out on a date. In addition to the text message, Murray began to follow Esperson around the store and repeatedly bring up his desire to date her. Esperson refused his attention by telling him to go away or to leave her alone, but sometimes Murray would disregard these requests. Murray also insulted Esperson's appearance, calling her names like "gap tooth."

Esperson informed her supervisors that Murray was following her around and showed them the text message that he had sent her. She requested that managers ensure that Murray did not take his lunch break at the same time as Esperson, but Murray's lunch break continued to occasionally overlap with Esperson's. In December 2013 Murray placed Esperson's winter boots in the freezer for some reason. When Esperson found out, she immediately informed Zisman.

On December 22, 2013, Esperson and Murray were assigned to open the store with floating supervisor Jasmine Miller. Due to inclement weather, Murray asked Esperson if he could borrow her Jeep to go to McDonald's for lunch. Esperson declined, and Murray responded by asking "[w]hy do you have to be such a bitch?" and stating that Esperson was being "such a fucking cunt." Miller promptly separated Esperson and Murray. Miller attempted to e-mail human resources after the incident, but her e-mail did not go through. Once he was informed of the incident, Marolt, who was serving as the acting store manager, instructed Esperson not to report the incident to human resources because human resources might respond by transferring Esperson to another store in order to separate her from Murray. Zisman, who was the store manager, subsequently informed Marolt that he needed to report the incident to human resources due to its serious nature. Ultimately, Zisman informed human resources of the incident in late January, 2014. Nunez, who

was a human resources consultant, conducted an investigation of the incident. Esperson, during her interview with Nunez, informed Nunez that she felt safe remaining at the Gurnee location and did not want human resources to transfer herself or Murray to another location. Instead, she asked that Murray be placed on a corrective action. Nunez concluded that Murray's conduct on December 22 constituted a violation of Verizon's code of conduct. Because Murray had received a final written warning nine months before, Nunez re-issued that final written warning.

Following the December 22 incident, Murray's conduct improved somewhat. In an unreported incident, however, Murray walked up to Esperson and informed her that her boyfriend was an "asshole." He also sent her a text message in February 2014 complaining that she had "dumped" a customer on him. Esperson was terminated soon thereafter.

During 2011 and 2012, Esperson dated Verizon Wireless Assistant Manager Aaron Ziomek, who worked at another location. Prior to Esperson's transfer to the Gurnee store, Zisman, the store manager of the Gurnee location, informed assistant store manager Sanchez that Esperson would be moving to their store, and that one of the reasons for her transfer was because she was dating Ziomek, who was a manager. According to deposition testimony, Zisman falsely informed Sanchez that Ziomek was married at the time he was dating Esperson.

**Legal Standard**

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In determining whether a genuine issue of material fact exists, this Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). However, "[m]erely alleging a factual dispute cannot defeat the summary

5

judgment motion." *Samuels v. Wilder*, 871 F.2d 1346, 1349 (7th Cir. 1989). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

**Discussion**

Verizon first contends that it is entitled to summary judgment on Esperson's sexual discrimination claim. Title VII makes it unlawful for an employer to discharge any individual or to otherwise discriminate against any individual because of her sex. 42 U.S.C. § 2000e-2(a)(1). In order to survive summary judgment, Esperson must present evidence that would allow a reasonable jury to find that her sex caused her firing. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Esperson approaches her evidentiary burden through the lens of the *McDonnell Douglas* burden-shifting framework, which is "a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases." *David v. Bd. of Trustees of Comm. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

Generally speaking, under *McDonnell Douglas* the plaintiff has the burden of establishing that (1) she is a member of a protected class, (2) her job performance reasonably complied with her employer's legitimate expectations, (3) she was subjected to an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably by the employer. *Id.* at 225. If Esperson satisfies that burden, it then becomes Verizon's burden to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to Esperson to submit evidence showing that Verizon's reason is pretextual. *Id.*

Here, it is undisputed that Esperson is a member of a protected class and that her termination constituted an adverse employment action. This Court therefore turns to the question of whether Esperson was meeting Verizon's legitimate expectations. Verizon argues that Esperson

6

was not meeting its legitimate expectations, as evidenced by her multiple consecutive "developing" grades at annual performance reviews and her repeated participation in performance improvement plans. Esperson responds that she had a very good rapport with customers, was very organized, and was within 3 percentage points of her plan target in 2013. The quality of Esperson's organizational skills or interactions with customers, however, has no bearing on whether or not she was meeting her employer's legitimate expectations in other respects. *See Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 980 (7th Cir 2004) (recognizing that an employee's acceptable performance for most of a period of employment "does nothing to rebut" an employer's contention that a specific aspect of her performance warranted termination). Esperson also asserts that a "developing" grade, unlike placement on a performance improvement plan, did not show that she was not meeting Verizon's legitimate expectations. To the contrary, three years of poor performance ratings provides an adequate basis for an employer to conclude that an employee is not meeting its expectations. Esperson's developing grades, moreover, were based on the many of the same performance metrics that resulted in Esperson's past progressive discipline.

Esperson also argues that Verizon has failed to explain why she was not meeting Verizon's legitimate job expectations after three developing grades when it treated her as if she was meeting its expectations after receiving one or two developing grades. Here, however, nothing in the record suggests that an employee with one or two developing grades was meeting Verizon's legitimate expectations. Nor would not be unreasonable for Verizon to conclude that three years of developing grades was one year too many. The determination of an employer's legitimate expectations is only based on the employer's bona fide expectations, because it is "no business of a court in a discrimination case to decide whether an employer demands 'too much' of [its] workers." *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1090 (7th Cir. 2000), *overruled on other grounds by Ortiz*, 834 F.3d 760. Here, it is undisputed that Verizon implemented a uniform regional policy to terminate all

7

employees who had received "developing" ratings for more than three years in a row. This uniform policy constitutes strong evidence that those employees were not meeting Verizon's expectations. Esperson has offered no evidence to call into question the bona fide nature of these expectations. This Court is equally unpersuaded by Esperson's conclusory assertion that she was meeting Verizon's legitimate expectations so long as she was exceeding the performance of at least one other employee. Esperson offers, and this Court is aware of, no legal basis for that argument.

Esperson has also failed to demonstrate a dispute of material fact as to whether similarly situated male employees were treated more favorably than her. In assessing whether someone is "similarly situated," courts conduct a flexible, commonsense examination of all relevant factors. *Anderson v. Office of Chief Judge of Circuit Court of Cook Cnty., Ill.*, 66 F. Supp. 3d 1054, 1064 (N.D. Ill. 2014) (Tharp, J.) (citing *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012). Nevertheless, the purportedly similarly situated employee must be "directly comparable to the plaintiff in all material respects." *Coleman*, 667 F.3d at 846 (citation and internal quotation marks omitted). Thus, in a typical case a plaintiff must be able to establish that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct "without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* (citation and internal quotation marks omitted). Although whether a comparator is similarly situated is usually a question for the fact-finder, summary judgment is appropriate when no reasonable fact-finder could find that the plaintiffs have met their burden on the issue. *Srail v. Village of Lisle, Ill.*, 588 F.3d 940, 945 (7th Cir. 2009).

Esperson asserts that Murray was similarly situated to her. Murray, at the time of the December 22 incident, had received a second written warning pursuant to a performance improvement plan. Rather than recommending Murray for termination, however, Verizon's human

8

resources department instead re-issued the purported final warning and extended the duration of his performance improvement plan.

Murray, perhaps, should have been fired for his misconduct; but that is not the question before this Court when assessing whether parties are similarly situated. Murray's disciplinary history was based on a pattern of misconduct involving insubordination, rudeness, and anger. Esperson, by contrast, had a history of poor performance and had received three "developing" ratings in her annual reviews. Esperson was terminated pursuant to a region-wide reduction in force targeting individuals objectively based on performance reviews evincing a record of poor performance. Murray's discipline, by contrast, was based on a subjective and individualized disciplinary process premised on Verizon's Code of Conduct. Given this distinction, no reasonable fact-finder could find that Murray and Esperson were similarly situated. Summary judgment is therefore appropriate on Esperson's sex discrimination claim.

*Sexual Harassment*

Title VII's general prohibition against discrimination by employers encompasses a prohibition against creating or permitting a hostile or abusive work environment. *Alexander v. Casino Queen, Inc.,* 739 F.3d 972, 982 (7th Cir. 2014). Title VII is violated when "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotations and citations omitted). In order to survive summary judgment on a hostile work environment claim, a plaintiff must introduce evidence sufficient to prove that (1) the work environment was both subjectively and objectively offensive; (2) the harassment was based on membership in a protected class; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability. *Alexander*, 739 F.3d at 982. Factors considered in assessing whether a work

9

environment is objectively offensive include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

As the Seventh Circuit has noted, it can be challenging to precisely define what constitutes a hostile work environment. *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995). Esperson focuses her argument primarily on the December 22 incident in which Murray called her a "bitch" and a "fucking cunt." The Seventh Circuit, in prior decisions, has recognized that the repeated and hostile use of such gender-derogatory insults can reasonably be considered evidence of sexual harassment. *Passananti v. Cook County*, 689 F.3d 655, 665 (7th Cir. 2012). Other circuits go further, recognizing that such insults inherently constitute harassment based upon sex. *See, e.g., Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 810 (11th Cir. 2010) ("Calling a female colleague a "bitch" is firmly rooted in gender. It is humiliating and degrading based on sex."); *Forrest v. Brinker Int'l Payroll Co., LP*, 511 F.3d 225, 229 (1st Cir. 2007) (recognizing a "raft of case law" establishing that the use of sexually degrading, gender-specific epithets such as "slut," "cunt," "whore," and "bitch" constitutes harassment based upon sex).

Here, it is unclear the extent to which Murray's outburst evinces sexual harassment. Murray only used gender-derogatory insults on one occasion and in a moment of anger when a non-gender-derogatory insult might have been just as likely to be used. A reasonable factfinder, however, could conclude that Murray's words constituted sexual harassment, especially in light of Murray's record of harassing conduct towards Esperson.

The record, taken in a light most favorable to Esperson, establishes that Murray constantly followed Esperson around the store (including into non-public spaces like stock-rooms), followed Esperson on her breaks, frequently asked Esperson to go out with him, continuously teased or mocked Esperson while she was at work, and, on at least one occasion, physically interfered with

10

Esperson's property. The record also reflects that Esperson complained of at least some of this behavior to her supervisors and requested that they prevent is. The evidence further suggests that Esperson's supervisors were independently aware of Murray's conduct through their own observations. On these facts, a jury could reasonably find that Murray's conduct was sufficiently severe and pervasive as to impact the conditions of Esperson's employment. *See Savino v. C.P. Hall Co.*, 988 F. Supp. 1171, 1187 (N.D. Ill. 1997) (recognizing that sophomoric comments, compounded with more threatening or serious misconduct, can constitute a hostile working environment where they focus specifically and ominously on a single victim); *see also Minor v. Ivy Tech State College*, 174 F.3d 855, 858 (7th Cir. 1999) (recognizing that stalking a female employee constitutes sexual harassment).

Verizon contends that it responded to the plaintiff's complaints in a manner reasonably calculated to prevent and correct the alleged harassment. This is true, perhaps, of Verizon's response to the December 22 incident. The record, however, is replete with potentially harassing conduct prior to December 22 that Verizon failed to address or, as it does in its briefs, shrugged off as "back and forth banter" between coworkers. Taking the evidence concerning the severity of Murray's conduct and management's response in Esperson's favor, a question of fact remains as to whether Verizon did enough to prevent and correct the harassment that Esperson has alleged.

*Retaliation*

Verizon also contends that this Court should grant summary judgment on Esperson's claim of retaliatory discrimination in violation of Title VII of the Civil Rights Act of 1964. Under Title VII, it is illegal for an employer to discriminate against an employee because she opposed an employment practice made unlawful by Title VII or made a charge, testified, assisted, or participated in an investigation or proceeding under Title VII. 42 U.S.C. § 2000e-3. In order to survive summary judgment on this claim, Esperson must present evidence that would allow a reasonable jury to

conclude that her firing was caused by her statutorily protected activity. *Ortiz*, 834 F.3d at 765; *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016).

Verizon first argues that Esperson did not engage in statutorily protected activity because, although she complained of harassment, she did not complain of sexual harassment. It is well established that an employee's complaint must indicate that the harassment occurred because of her sex or must provide facts sufficient to create that inference in order to constitute a statutorily protected activity. *Orton-Bell v. Indiana*, 759 F.3d 768, 776 (7th Cir. 2014). Although this Court agrees that Esperson did not expressly predicate her complaints to supervisors on a sexual harassment theory, the evidence readily suggests that Verizon should have inferred that Esperson was complaining of sexual harassment given the nature of Murray's observed and reported conduct.

Verizon also argues that Esperson has failed to show a causal connection between her protected activity and her termination. As previously noted, Esperson has not identified any similarly situated employees who were treated favorably to her. Esperson has also failed to provide sufficient evidence to establish that Verizon's reason for her termination was pretextual. Instead, Esperson focuses on the suspicious timing of her termination.

Esperson does not dispute that the process by which she was terminated was based solely on objective criteria and was initiated prior to the December 22 incident. Esperson also, surprisingly, does not argue that she was terminated because of Murray's harassment or her complaints about it. Instead, she argues that the decision makers behind her termination failed to take that harassment into account as a mitigating circumstance justifying her consecutive "developing" ratings. She also alleges, without any supporting evidence, that the delays by her supervisors in reporting the harassment were attempts to prevent the harassment from being taken into account as a mitigating factor against her termination. These arguments, however, are irrelevant to the question of whether Verizon retaliated against Esperson as a result of her complaints of sexual harassment. Esperson

offers, and this Court is aware of, no legal authority imposing a duty on Verizon to consider Esperson's harassment as a mitigating circumstance when reviewing her performance. Nor does Esperson establish that the delay she complains of constitutes an "adverse action" within the meaning of the statute.

In order to succeed on her retaliation claim, Esperson must identify evidence capable of establishing that her termination resulted from her protected activity. It is undisputed that Esperson was terminated pursuant to a region-wide process in which all employees with more than three consecutive years of "developing" ratings were terminated. There is no evidence before this Court to suggest that her termination was motivated by or resulted from her protected activity. Esperson has therefore failed to establish a dispute of material fact with respect to her retaliation claim.

*Negligent Retention*

Verizon contends that it is entitled to summary judgment on Esperson's negligent retention claim because that claim is preempted by the Illinois Human Rights Act ("IHRA"). Under IHRA, "no Court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act." 775 ILCS 5/8-111(D). IHRA establishes that it is a civil rights violation for an employer or employee "to engage in sexual harassment," and clearly includes within this definition situations where "the employer becomes aware of the conduct [of nonsupervisory employees] and fails to take reasonable corrective measures." 775 ILCS 5/2-102. State tort claims are preempted by the IHRA where the facts are "inextricably linked" to the civil rights violations listed in the IHRA. *Geise v. Phoenix Co. of Chi., Inc.*, 639 N.E.2d 1273, 1276–78, 159 Ill.2d 507 (1994). Here, Esperson does not challenge the assertion that her negligent retention claim is inextricably linked to her alleged sexual harassment. Instead, Esperson states that she will amend her complaint to add a claim of assault to underpin her negligent retention claim. Esperson has not yet amended her complaint, however, and her statement that she will do so is therefore irrelevant to this Court's

13

ruling on the motion before it. *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996). This Court accordingly lacks jurisdiction to consider Esperson's negligent retention claim.

*Defamation*

Finally, Verizon contends that Esperson has failed to state a claim for defamation per se. Under Illinois law, a defamation action may state a claim either for defamation per se (statements so harmful to reputation that damages are presumed) or defamation per quod (statements requiring extrinsic facts to show their defamatory meaning). *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 924 (7th Cir. 2003). In pertinent part, a claim of defamation per se can be premised upon a statement imputing adultery. *Id.*

Esperson's defamation claim is premised entirely on assistant store manager Sanchez' deposition testimony. At the deposition, Sanchez testified that store manager Alan Zisman told him that Nicole was having a relationship with Ziomek. Sanchez also clearly testified, in multiple statements, that Zisman had told him that Ziomek was married. Following the deposition, Sanchez provided errata "correcting" a number of his answers. These corrections changed Sanchez's explicit admissions that Zisman had told Sanchez that Ziomek was married into statements that Sanchez "didn't know" whether Ziomek was married at the time.[2]

The "errata" changes that Sanchez proposed changed the substance of his statements and contradicted his prior testimony. Accordingly, that changed testimony cannot be considered on summary judgment. *See Thorn v. Sunstrand Aerospace Corp.*, 207 F.3d 383, 389 (7th Cir. 2000) ("[A] change of substance which actually contradicts the transcript is impermissible unless it can plausibly be represented as the correction of an error in transcription, such as dropping a 'not.'"). In any

---

[2] By way of example, one of the proposed changes altered the answer to the question "Are you saying that she was dating a married man?" from "[s]o the reason why I said that is because Alan Zisman told me that [Ziomek] was married" to "I don't know if Aaron was married when they dated." (Dkt. 92-9 220:12-222:9; Dkt. 70-8 pp. 18–21).

14

event, this Court notes that the errata left uncorrected several statements reporting that Zisman had told Sanchez that Esperson was dating a married man.

Verizon argues that summary judgment is proper because plaintiff has not presented evidence of adverse consequences resulting from Zisman's statements. Courts, Verizon asserts, have recognized that a plaintiff must present some degree of competent evidence to establish reputational or emotional harm in a defamation per se claim. This argument is incorrect and misleading. As Verizon is forced to concede in its own briefs, damages are presumed in defamation per se cases. *See Dunlap v. Alcuin Montessori Sch.*, 698 N.E.2d 574, 580, 298 Ill.App.3d 329 (1998) ("If a defamatory statement is actionable *per se*, the plaintiff need not plead or prove actual damage to his or her reputation in order to recover."). The cases cited by Verizon do discuss the need for evidence of reputational or emotional harm in defamation per se actions, but they do so exclusively in the context of a jury's damages calculation, a context clearly irrelevant to the present motion. Indeed, Verizon fails to identify a single case suggesting that a showing of reputational or emotional harm is necessary or relevant at the summary judgment stage. The Court therefore rejects Verizon's argument on this point.

Finally, Verizon argues that the statements at issue are subject to a qualified privilege. A qualified privilege exists where a communication that might otherwise be actionable is not actionable due to the occasion or circumstances under which it was made. *Popko v. Cont'l Cas. Co.*, 823 N.E.2d 184, 190, 355 Ill.App.3d 257 (2005). This privilege encompasses situations where the publishing party has an interest in the allegedly defamatory statement, such as when a corporate employer is investigating conduct by its employees. *Id.* Here, however, this Court struggles to see how Verizon had an interest in informing an assistant manager that an employee transferring to their location was being transferred because they had been romantically involved with a married coworker. Verizon, moreover, has offered neither legal authority nor factual argument to explain the corporate interest

15

underlying this disclosure.  At a minimum, this Court therefore concludes that a dispute of material fact regarding the application of the qualified privilege exists.

**Conclusion**

For the foregoing reasons, this Court grants summary judgment on counts I and III, and IV, and denies summary judgment on counts II and V.

IT IS SO ORDERED.

Date:   August 4, 2017

Entered: _____
SHARON JOHNSON COLEMAN
United States District Court Judge